COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-279-CV

 

 

IN THE INTEREST OF J.S.,                                            

M.N.S.C.,
AND T.S.,

CHILDREN                                                                                          

 

                                                                                                        

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Introduction








Appellant N.S. appeals the
trial court=s order
terminating her parental rights to her children, J.S. (John), M.N.S.C. (Mary),
and T.S. (Tom).[2]  In two issues, appellant argues that the
evidence is legally and factually insufficient to support the trial court=s best interest finding.  We
affirm.

Background Facts

On February 24, 2006,
appellant took her two-and-a-half-year-old daughter Mary to the emergency room
because she had stopped breathing. Appellant told doctors that Mary had fallen
off the bed and that she might have consumed dish soap.  Doctors, however, believed that Mary was
intentionally injured due to her numerous, severe injuries.  Dr. Steven Perilman, the pediatric emergency
physician at Cook Children=s Hospital who examined her, testified that she had left-sided
phoresis, a condition which caused the left side of her body to be noticeably
weaker compared to the other side.  Mary
also had a subdural hematoma, which was life-threatening and required emergency
surgery.  The subdural hematoma was
putting enough pressure on her brain to cause her right eyelid to not open
properly, a condition known as ptosis, which caused a loss of
consciousness.  If symptoms such as
ptosis persisted, swelling and pressure on the brain would push on the brain
stem and stop the cardiorespiratory part of the brain.  During Mary=s emergency brain surgery, doctors also discovered a previous head
injury.  Doctors believed that Mary=s brain bleed was caused by shaking.








Additionally, Dr. Perilman
testified that Mary had a small bruise on her left chin, a bruise on the
midline of her lumbar spine area, a very severe diaper rash that caused the
outer layer of her skin to burn, intraoral burns, burned tonsils, white-coated
ulcers on both sides of her soft pallet, swollen lips, and fractures on the
middle and ring fingers of her left hand. 
On February 27, 2006, TDFPS removed Mary from appellant=s care as well as her four-year-old brother, John.[3]


Detective Wayne Goodman with
the North Richland Hills Police Department arrived at the hospital after Mary=s surgery to investigate.  He
spoke with appellant who claimed that Mary had fallen out of bed and had
consumed dish soap.  After Detective
Goodman explained to appellant that Mary=s injuries were inconsistent with her explanation, appellant blamed
her live-in boyfriend Mark McBride.[4]  However, when Detective Goodman interviewed
appellant again on March 27, 2006, she told him that McBride had nothing to do
with the injuries, and she reiterated her initial explanation.  








At the time of the incident,
appellant lived with McBride, her two children Mary and John, and McBride=s adult daughter, Allison. 
Appellant told Detective Goodman that McBride got up with the children
around 6:00 a.m. and took care of them until she woke up around 11:00 a.m.  Appellant stated that McBride left the home
but later returned. Sometime in the afternoon, Mary began to vomit and have
uncontrollable diarrhea.  When Mary
became limp, appellant took her to the emergency room.  Detective Goodman was unable to eliminate
appellant, McBride, or Allison as the person responsible for Mary=s injuries. 

TDFPS placed Mary with foster
parents, D.S. and C.C., as soon as she was released from the hospital.  D.S. testified that Mary=s condition was shocking.  Mary
was inconsolable and cried for five days. 
She was very frail and in pain; D.S. also said that Mary=s diaper rash was horrid and that she could not make her
comfortable.  D.S. also testified that,
at the time of trial, Mary was doing miraculous despite the fact that she still
had a lot of pain in her head and had nosebleeds every night.  D.S. stated that Mary needed a structured
environment and learned by repetition. 
Mary threw tantrums easily if disrupted and had difficulty expressing
herself although her vocabulary had doubled. 
Additionally, Mary would need another surgery on her skull, and because
she was susceptible to injury, she wore a helmet when playing outside. 








D.S. testified that John
arrived in their home three days after Mary. Although John was four years old,
he was still in diapers and ate with his fingers.  He crawled with his fingers tucked under his
knuckles and did not have the balance or coordination to stand by himself.  At the time of trial, John was
potty-trained.  John had also learned to
crawl properly and had been fitted with leg braces.  He had progressed to a walker and was also
fitted for a brace on his right hip. 
Additionally, John wore special splints at night.  He had also learned to eat with a fork and
spoon and was in speech therapy. 

D.S. also testified that John
tried to avoid visits with appellant. 
For example, he had learned how to ask to go to the bathroom to escape
spending time with appellant.  He also
experienced anxiety and panic attacks. 
For example, he experienced anxiety about going to school, and D.S. had
to reassure him that she would return to pick him up.

Additionally, D.S. testified
that John had acted out sexually.  For
example, D.S. discovered her adopted son lying on John=s bed with his pajamas off while John was playing with his foster
brother=s penis, calling it a Ashooter.@ After this
incident, D.S. contacted the caseworker, filed a report, gave the boys separate
bedrooms, and monitored their activities with an open door policy.  D.S. also testified that once when she and
John were in the car, John told her that Daddy Mark had a big shooter and that
he had a little shooter.  John told her
that Daddy Mark would touch him with his big shooter, touch his bottom with his
big shooter, and urinate on him. 








Shirley Poeck, John=s therapist, testified at trial that she had been counseling John
since January 2007.  John began
counseling after he acted out sexually with his foster brother and because of
anxiety over the safety of his siblings. 
John called his siblings Amy children,@ and he felt
like he was their protector.  For
example, John wanted to know how to use a telephone because he wanted access to
grown-ups things, which gave him a sense of being able to protect his
siblings.  Poeck testified that she
believed John had been sexually abused because of the actions he had
demonstrated.  John also did not want to
go to visitation with appellant, and he had anxiety about it.  Poeck testified that she believed it was in
John=s best interest to remain with his foster family. 

While Mary and John were
living with their foster family, appellant had another child, Tom.[5]  TDFPS did not know about Tom=s birth until twelve days after he was born; TDFPS then removed Tom
and also placed him with D.S. and C.C. 
D.S. testified that Tom was developmentally delayed and, at the time of
trial, was receiving occupational and physical therapy twice a week.  D.S. also testified that she and C.C. would
like to adopt all three of the children.








Jessica Puryear, the TDFPS
caseworker assigned to this case, testified that appellant had worked her
services, but she still had concerns about appellant=s ability to parent.  Appellant=s service plan included parenting classes, anger management,
individual therapy, and a psychological evaluation; appellant completed all of
these services. 

Additionally, Puryear also
asked appellant to educate herself about cerebral palsy and shaken baby
syndrome, which appellant did.  Appellant
regularly visited the children, and Puryear stated that on most occasions she
did well with the visits and acted appropriately.  Although appellant struggled with balancing
the children=s needs when
all three children were present, she tried to apply what she had learned in the
parenting classes.  For example,
appellant brought the same toys to visits each week to establish consistency. 

Appellant also maintained
steady employment.  She worked at Man=s Best Friend from July 2006 until recently when she got a new job as
a restaurant hostess in downtown Dallas. 
Initially, appellant lived in Tarrant County, but she moved to Dallas to
be closer to her new job and the location of the visitations. Puryear also
testified that appellant was good about staying in touch with her. Although
appellant had learned some parenting skills, she could not provide TDFPS with a
clear plan on how to meet the children=s medical and physical needs. 
For example, appellant did not have beds or rooms for them when Puryear
last visited appellant=s apartment.









        Although appellant worked her service
plan, Puryear recommended that appellant=s parental rights be terminated because of the number of injuries Mary
sustained, the uncertainty regarding who caused the injuries, and the amount of
neglect experienced by the children.

Susan Chapman, a supervisor
at Child Advocates of Tarrant County, testified that it was inconceivable that
appellant did not know about Mary=s injuries.  She stated that
appellant committed the injuries herself or was in the house when the injuries
occurred because Mary would have been screaming.  Chapman attended visitations and stated that
appellant usually brought her mother and her sister with her.  Normally, appellant=s mother or sister would feed Tom, but sometimes appellant would also
feed him.  She testified that appellant
did engage with the children, but her role was passive.  Chapman also said that the children
interacted and were attached to their foster family. Chapman recommended that
appellant=s parental
rights be terminated and that it was in the children=s best interests to stay with the foster family.








The termination bench trial
was held on July 17 through 19, 2007. 
Nancy McNeil, a pediatric nurse practitioner who worked at a specialty
clinic for foster children, testified that she first saw John on March 10,
2006.  She testified that John had
significant gross motor delays because of his cerebral palsy, which affected
his legs.  At that time, John was four
years old and not walking, and he could not go from a kneeling position to
crawling or sitting up by himself, which children usually accomplish at nine
months.  John was also unable to use his
arms effectively like a toddler, and he did not have the ability to pull
himself on a toy or pull his legs up so that he could ride a toy or truck.  Although John was articulate, McNeil
testified that he was actually only repeating what others said without
understanding. 

McNeil last saw John on
February 2, 2007, and she testified that he had made great strides with his
physical development.  He was in physical
and occupational therapy and had received Botox injections to help with his mobility.  Additionally, he used a walker and had a
motorized wheelchair; John also had braces and could stand by himself.  John=s language skills had also improved greatly. 

McNeil first saw Mary on
March 3, 2006, and she was below the third percentile for weight.  At the time of trial, however, she was above
the twenty-fifth percentile and had grown rapidly.  Because of Mary=s surgery, her skull plate was gone, so she had no protection on that
area of her head.  Any roughhousing or
swinging was discouraged because if she hit her head, it would be dangerous.  McNeil did not know the extent of the damage
due to the brain hemorrhage; doctors would have to continue to monitor her. 

McNeil saw Tom when he was
two weeks old, and she felt that he had not gained the appropriate amount of
weight for a newborn.  However, Tom had
steadily gained weight since being with the foster family.








McNeil testified that the
children were getting loving care in their foster home; they were bonded to the
foster parents and had a warm attachment to them.  They were happy, thriving, and well-behaved.  McNeil testified that it was in the children=s best interest that they remain together in the foster home. 

Appellant, who was twenty-two
at the time of trial, testified that she became pregnant with John when she was
sixteen years old.[6]  When John was one year old, appellant met
M.C. on the Internet; appellant left John with her mother for six to nine
months so that she could work and save money to move in with M.C.  Appellant saved money and she, John, and M.C.
then lived together in Missouri. 
Appellant and M.C. had Mary in 2004. 
Appellant testified that M.C. was physically, emotionally, and sexually
abusive; he choked her and left bruises on her arm.  In September 2005, appellant met McBride at a
Cracker Barrel, where she was working at the time, and he helped her get away
from M.C.  She testified that she knew
McBride had a criminal background, but she did not know the specifics.  McBride and appellant moved to Texas with
John and Mary. 








Appellant testified that on
February 24, 2006, she was at home with her children.  McBride was also home on and off that day,
and he told her that Mary was fine when she woke up.  Appellant said she did not notice that Mary
was sick until later in the day when she started vomiting and having diarrhea.  Mary became cold and then stopped moving or
breathing, so appellant took her to the emergency room.  Mary had not been crying until she began to
vomit. Appellant testified that she had no idea what happened to Mary.  She also stated that she knew about Mary=s diaper rash but that she did not have any money or a car to take
Mary to a clinic.  She testified that it
bothered her that she did not know who hurt her daughter. 

Appellant testified that she
was dating someone, but she had not told TDFPS. 
She said that she would not allow any men around her children.  She stated that her boyfriend gave her a car
to use. 

Appellant also testified that
she helped TDFPS get Mary=s medical
records from Missouri.  John went to
therapy in Missouri, but not after they moved to Texas because she did not have
a car or control over anything.  She said
that she did John=s exercises
with him at home.  Before her children
were removed, she had contacted Scottish Rite Hospital to get therapy for John.









Appellant completed parenting
classes, anger management classes, and regularly visited her children.  She testified that she was better equipped to
provide a safe and stable home for her children.  Appellant stated that she wanted to go back
to school and have someone come into her home and teach her the physical
therapy that John needed.  She wanted to
take them to school, and she would adjust her work schedule.  She also stated that she wanted to go to
family counseling.  Appellant testified
that she visited a therapist once a week, had worked on her issues with men,
and had learned to identify signs of an abusive relationship.  She had learned to not be dependent on anyone
else. 

Although appellant was not
working at the time her children were removed, she got a job at Man=s Best Friend, which was a kennel and dog training facility.  She worked there for a year, but she left in
April 2007 so she could move to Dallas to be closer to visits.  Appellant testified that she had a job as a
hostess at a restaurant in downtown Dallas. 
She stated that she worked forty hours a week for ten dollars an
hour.  She had a two-bedroom apartment in
Dallas.  At the time of trial, appellant
testified that her mother and her sister were living with her, but her sister
would be moving out in the next week. 
Appellant testified that she was the primary person who paid the bills. 








Carol Lennox, appellant=s therapist, testified that she had been seeing appellant since March
30, 2006, and she believed appellant had made amazing progress.  Lennox also testified that appellant had been
consistent and cooperative, maintained employment, and completed parenting
classes and anger management classes. 
She stated that appellant=s dedication to therapy was unusual. 

Lennox stated that she was
not aware of appellant=s living
situation, but she believed that appellant was capable of providing a safe home
for her children and that appellant was not the same person she was a year ago.
Additionally, Lennox testified that she and appellant discussed appellant=s abuse as a child by appellant=s mother=s live-in
boyfriend. 

Although Lennox was aware
that Mary=s
perpetrator was not ascertainable, she did not believe that appellant=s parental rights should be terminated because she had made progress
rarely seen and showed tremendous concern for her children.  She and appellant had discussed several
options such as John=s returning
to appellant while the younger children could be adopted by the foster
parents.  Lennox testified that this was
better than termination although she agreed it was not good for the children to
be separated.  She also testified that
they had discussed open adoption, which would allow appellant to see her
children once a month unsupervised. 








Mila J., Mary=s paternal grandmother who lived in Hot Springs Village, Arkansas,
testified that appellant called her in February 2006 and told her that Mary was
in the hospital and that TDFPS had taken John. 
Mila had not heard from or seen appellant or her grandchild since
appellant left M.C. in September 2005. 
Appellant had emailed Mila, but Mila did not know where they were.  Mila testified that she was close to John and
Mary and that she was concerned about John when he was not walking at two and a
half.  She had witnessed appellant and
M.C. doing exercises with John and knew that John had leg braces. 

TDFPS gave Mila and her
husband, Buford, permission to visit the children in March 2006.  They then contacted a lawyer in July or
August 2006 to try to get custody of Mary.[7]  However, Mila testified that she and her
husband had established a bond with the foster family as had the children, and
she did not think it was in the children=s best interest for them to be separated.  








After a three-day bench
trial, the trial court determined that appellant (1) knowingly placed or
knowingly allowed her children to remain in conditions which endangered their
physical and emotional well-being, (2) engaged in conduct or knowingly placed
her children with persons who engaged in conduct which endangered their
physical or emotional well-being, and that (3) termination was in their best
interest.[8]  See Tex.
Fam. Code Ann. '' 161.001(1)(D),
(E), (2) (Vernon Supp. 2007).  Appellant
timely filed this appeal. 

Statement of Points

As a preliminary matter, we
address the State=s contention
that appellant=s issues in
her statement of points and motion for new trial are too vague and lack
specificity.  Section 263.405(i) of the
Texas Family Code provides,

The
appellate court may not consider any issue that was not specifically presented
to the trial court in a timely filed statement of the points on which the party
intends to appeal or in a statement combined with a motion for new trial.  For purposes of this subsection, a claim that
a judicial decision is contrary to the evidence or that the evidence is
factually or legally insufficient is not sufficiently specific to preserve an
issue for appeal.[9]








The relevant portions of
appellant=s combined
motion for new trial and statement of points allege that the evidence is
legally and factually insufficient to support the trial court=s findings: (1) that she knowingly placed or knowingly allowed her
children to remain in conditions or surroundings which endangered their
physical or emotional well-being, (2) that she engaged in conduct or knowingly
placed her children with persons engaged in conduct which endangered their
physical or emotional well-being, and (3) that termination of the parent-child
relationship was in John=s, Mary=s, and Tom=s best
interest. 

Here, appellant=s statement of points identifies the challenged trial court=s findings, outlines the elements of those findings, and raises legal
and factual insufficiency claims.  Thus,
appellant=s statement
of points was specific enough to allow the trial court to correct any erroneous
findings on the challenged grounds.  In
re J.W.H., 222 S.W.3d 661, 662 (Tex. App.CWaco 2007, no pet.); In re A.J.H., 205 S.W.3d 79, 80 (Tex. App.CFort Worth 2006, no pet.).  We
therefore address appellant=s legal and factual sufficiency challenges to the best interest
finding.[10]

Standard of Review








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d
534, 547 (Tex. 2003).  While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right. 
In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not
just to limit parental rights but to end them permanentlyCto divest the parent and child of all legal rights, privileges, duties,
and powers normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20-21; In re E.M.N., 221 S.W.3d 815,
820 (Tex. App.CFort Worth
2007, no pet.).

In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  TEX. FAM. CODE ANN. ' 161.001;
In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).








Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  TEX. FAM. CODE ANN. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002).  This intermediate standard
falls between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).

A. Legal Sufficiency








In reviewing the evidence for
legal sufficiency in parental termination cases, we must determine whether the
evidence is such that a fact-finder could reasonably form a firm belief or conviction
that the grounds for termination were proven. 
In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the evidence in the light
most favorable to the finding and judgment. 
Id.  This means that we
must assume that the fact-finder resolved any disputed facts in favor of its
finding if a reasonable fact-finder could have done so.  Id. 
We must also disregard all evidence that a reasonable fact-finder could
have disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable fact-finder could
and disregard contrary evidence unless a reasonable fact-finder could not.  Id.

We must therefore consider
all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id. at 573.

B. Factual Sufficiency








In reviewing the evidence for
factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether, on
the entire record, a fact-finder could reasonably form a firm conviction or
belief that the termination of the parent=s parental rights would be in the best interest of the child.  C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable fact-finder could not have credited in
favor of the finding is so significant that a fact-finder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108.  If we reverse on
factual sufficiency grounds, then we must detail in our opinion why we have
concluded that a reasonable fact-finder could not have credited disputed
evidence in favor of its finding.  J.F.C.,
96 S.W.3d at 266-67.

Applicable Law

Prompt and permanent
placement of the child in a safe environment is presumed to be in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(1)    the desires of the child;

 

(2)    the emotional and physical needs of the child now and in the
future;

 

(3)    the emotional and physical danger to the child now and in the
future;

 

(4)    the parental abilities of the individuals seeking custody; 

 

(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home or proposed placement;








(8)    the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(9)    any excuse for the acts or
omissions of the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976). 

These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

Analysis

A. Desires of the children








At the time of trial, John
was five years old, Mary was three years old, and Tom was eight months
old.  Caseworker Puryear testified that
most of the time, the children were excited to see appellant.  Foster parent D.S testified that Mary enjoyed
seeing appellant because appellant brought food to the visits, and Mary liked
to eat.  Puryear also testified that the
children were bonded with appellant. 
Appellant testified that John asked her if he could come live with her
when he was bigger.  However, D.S. testified
that she had never heard John tell appellant that he wanted to live with
her.  Instead, she testified that John
had anxiety and panic attacks before visitations and that he tried to get out
of visiting with appellant.  In the two
weeks before trial, John would scream for an hour on the days that he had
visits with appellant.  Chapman testified
that during the last visit between appellant and the children, she could tell
that John was upset and did not want to be there.  She stated that John was very anxious and
wanted to leave.  Appellant tried to give
John some money to divert his attention, which briefly calmed him down, but he
left the visiting room as soon as the visit was over. 

John=s therapist Poeck also testified that John did not want to attend
visits and that he had increased anxiety about going to visits with appellant;
further, John had started to have stomach aches, which indicated his anxiety
about visiting his mother had become physical and not just behavioral.
Additionally, when he was at a visit, John would look for his foster mother,
and if he could not hear or see her, he would have to go find her, which was a
form of separation anxiety.  Poeck also
testified that John had never said anything to her to make her think he was
bonded with appellant, and she believed John could move on without appellant
because he had become strongly bonded to his foster family.  Poeck stated that John needed closure so that
his separation anxiety would not get worse. 








There is also evidence that
John would like to be adopted by his foster family.  D.S. testified that when she and her partner
adopted their other two children, they celebrated a AForever Day@ to signify
the day the child was brought into their family.  They took a AForever Day@ photograph
so that their children would remember the day they became a part of their
loving family. D.S. testified that John had asked for a AForever Day@ photograph
on many occasions.

The evidence shows that John
was not benefitting from visits with appellant. 
Additionally, it would be detrimental to the children, and especially
John, if they were separated.  Further,
it was in the children=s best
interest to stay together in their current environment because they had bonded
with their foster family.  

B.
The emotional and physical needs of the children now and in the future, and the
emotional and physical danger to the children now and in the future

 








The evidence demonstrates
that Mary had suffered numerous intentionally inflicted injuries, the most
severe of which was a subdural hematoma that required emergency brain
surgery.  In addition, Mary had bruises
on her chin and back, burns in and around her mouth, burned tonsils, ulcers,
and a severe diaper rash.  Doctors also
discovered untreated past injuries that were likely caused by shaking, and the
surgery left a portion of her skull unprotected.  Additionally, Mary was underweight and had
problems eating.  For example, she would
continue to eat until she was sick.  At
the time of trial, although Mary had nightly nosebleeds and headaches, she had
grown and was doing great physically and emotionally. 

John has cerebral palsy,
which had been untreated and caused significant developmental
delays.  When John was first removed, he
was barely mobile, in diapers, could not use his arms effectively, and could
not dress or feed himself; however, since being with his foster family, John had
been potty trained, could walk with the assistance of braces and a walker, and
could feed and dress himself.  John had
also received speech, physical, and occupational therapies and made great
strides in his physical development. 
There is also evidence that John was sexually abused.

TDFPS did not know appellant
was pregnant with Tom until August 2006, and appellant did not tell her
caseworker when Tom was born in November 2006. 
Before being removed, Tom had not gained weight, and pediatric nurse
McNeil was concerned that appellant had not sought prenatal care.  Appellant=s therapist Lennox, however, testified that she thought appellant had
received prenatal care.  TDFPS removed
Tom because he was at risk due to the severe neglect of John and the injuries to
Mary.  Since living with the foster
family, Tom had not encountered any weight issues. 








The evidence shows that
appellant had maintained adequate housing and steady employment.  Appellant initially lived and worked  in Tarrant County, but she moved to Dallas
after finding a better job and to be closer to visits with her children.  Puryear testified that she knew appellant had
gotten a new job in Dallas but did not know that she had moved until she read
Lennox=s report in June. At the time of trial, appellant lived in a two
bedroom apartment in Dallas with her mother, sister, and sister=s baby.  Although the apartment
was not dirty when Puryear visited, she testified that there were no beds set
up for the children and that medication was within John=s reach.  Appellant, however,
testified that she had two twin beds and a baby bed for her children.  Puryear did not believe appellant=s home was ready for children based on the condition of her
apartment.  The evidence also shows that
appellant paid her bills and had reliable transportation. 

TDFPS was also concerned
about appellant=s mother
living with her because appellant=s mother continued to live with appellant=s abuser after learning about the abuse.  However, appellant confronted her mother, and
appellant testified that her mother was not a danger to her children.  

C.
The parental abilities of the individuals seeking custody, and
the programs available to assist these individuals to promote the best interest
of the children

 








The evidence demonstrates
that appellant worked her service plan. 
Appellant completed parenting classes, anger management classes,
individual therapy, and a psychological evaluation.  Lennox testified that appellant attended
individual therapy sessions regularly, was diligent about working on her
personal issues, and had accepted responsibility for her children=s injuries and neglect.








Nichelle Wiggins performed a
psychological evaluation on May 9, 2007. 
Wiggins testified that appellant had a low/average IQ; appellant could
learn new information, but it might take her extra time.  Appellant=s reading and spelling skills were at a high school level, and math
was her weakness.  Wiggins also testified
that appellant had maintained employment for the past nine months, was seeking
help for her depression, and never had an alcohol or drug abuse problem.  Wiggins stated that appellant had major
dependency issues, was passive, and tended to get involved with men who were
abusive.  She also testified that
appellant had poor self-esteem and a dependent personality disorder.  Wiggins noted that appellant displayed
significant symptoms that required treatment, but she was still able to
function; she testified that appellant needed psychiatric intervention and
counseling.  Additionally, Wiggins said
it was a strength that appellant had been consistently going to
counseling.  However, one of her concerns
was that appellant became involved in relationships that were destructive and
led to poor decision making.  Wiggins
also testified that she was concerned about appellant=s ability to protect her children in the future and accept
responsibility for maintaining their safety. 
Appellant=s dependency
issues and history of abusive relationships were also concerns for
Wiggins.  As of the date of appellant=s evaluation, Wiggins thought the children should remain in protective
care.  

The record shows that
appellant had a history of abusive relationships, which caused TDFPS concern
that she would enter into future unhealthy relationships.  Additionally, appellant did not tell TDFPS
about her relationship with her new boyfriend, Allen B., which appellant should
have realized was an important issue about which TDFPS needed to be
informed.  Although Lennox knew of the
relationship, she testified that she did not believe appellant was at risk to
become involved in another harmful relationship.  

The record contains evidence
that Lennox believed appellant had made significant progress and had the
ability to parent her children.  Puryear
and Chapman, however, disagreed with Lennox=s evaluation and believed appellant=s parental rights should be terminated.  The trial judge as fact-finder was free to
assess the credibility of Lennox, Puryear, and Chapman.  See J.P.B., 180 S.W.3d at 573. 








The record also demonstrates
that appellant regularly visited her children and applied the skills that she
had learned in the parenting classes. 
However,  John was anxious about
visitations and avoided spending time with appellant.  

Although appellant completed
all of her services, TDFPS was not able to recommend returning the children to
appellant because of the extent of Mary=s injuries and John=s medical neglect.  Furthermore,
appellant had not provided TDFPS with a plan on how to meet the children=s medical needs in the future. 

D.
The plans for the children by these individuals or by the agency seeking
custody, and the stability of the home or proposed placement

 

Regarding future plans for
the children, TDFPS=s goal was
to have the foster family adopt all three children.  D.S. testified that she and C.C. would like
to adopt the children and that they considered John, Mary, and Tom part of
their family.  Mary=s grandparents, Mila and Buford, who had filed a suit in intervention,
decided to not pursue custody of Mary after seeing how happy she was with the
foster family. Mila testified that it was best for the children to remain
together.  In addition, Mila and Buford had
established a bond with the foster family; D.S. testified that the they had
become D.S.=s and C.C.=s pseudo-parents and visited often. 

Appellant did not provide
TDFPS with any other relatives as placements. 








E.
The acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one, and any excuse for the acts or
omissions of appellant

 

As for the parent-child
relationship, there is evidence that John felt that he was the protector of his
siblings and often referred to them as his children.  John had gradually let go of his protector
role since being with his foster family although he still worried about Mary
and Tom when they were not with him.  John
had worried about Tom before he was removed. 








The evidence demonstrates
that appellant claimed that she did not know who caused Mary=s injuries nor did she appear appropriately concerned for Mary at the
hospital.  However, Chapman testified
that Mary would have been screaming when the injuries occurred so appellant=s testimony that she did not know who or how the injuries were caused
is doubtful.  Additionally, appellant
stated that Mary=s head
trauma could have been caused by falling off the bed, but doctors explained
that Mary=s head
injury was the type of injury that was the equivalent of falling from a
two-story building.  Appellant also
stated that Mary might have consumed dish soap, but the doctors believed the
intraoral burns were caused by being force fed hot food or by a chemical burn.  Appellant explained Mary=s broken fingers by claiming that John had pushed a toy truck over
Mary=s hand and then sat on the truck. 
However, pediatric nurse McNeil, who examined John immediately after he
was removed, testified that she doubted that John would have had the physical
ability to pull himself onto a toy truck. 
D.S. also testified that when John first came to live with her family,
he could not pull himself onto a chair or toy because he lacked the upper body
strength.  Thus, appellant=s explanations for Mary=s injuries were highly unlikely.

Additionally, appellant=s story regarding the whereabouts of McBride on February 24, 2006,
were inconsistent although she had always stated that she was at home.  Appellant told psychologist Wiggins that she
thought McBride may have injured Mary, but at the time of that interview,
appellant still lived with him. 
Appellant also did not know if McBride=s daughter Allison was responsible for Mary=s injuries, and appellant continued to live with her for a short time
after the children were removed. 
Appellant also failed to tell Wiggins about Mary=s additional injuries.  Wiggins
testified that appellant knew that TDFPS could terminate her parental rights,
so she was not surprised that appellant was not forthright.

Moreover, appellant did not
appear to understand the seriousness of Mary=s injuries before or after her children were removed.  For example, appellant and her mother would
swing Mary around during visits, which was a dangerous activity because of the
unprotected area on her head. 








The evidence also shows that
appellant did not secure the appropriate medical equipment or therapy for
John.  There is evidence that John had
leg braces and received therapy in Missouri, but appellant failed to continue
these services when she moved to Texas with McBride, which caused John=s development to regress significantly.

In sum, the record demonstrates
that although appellant diligently completed her services, the severity of Mary=s injuries, TDFPS=s uncertainty as to the identity of the person or persons who inflicted
the injuries, along with appellant=s continued failure to grasp the severity of those injuries, her
denial of the intent and nature of the injuries, her failure to inform TDFPS of
her new boyfriend, and the intentional neglect of the children, all demonstrate
that it was in John=s , Mary=s, and Tom=s best
interests that appellant=s parental
rights be terminated.  See Tex. Fam. Code Ann. ' 161.001(2). 

Viewing all the evidence in
the light most favorable to the judgment, we hold that the evidence is legally
sufficient to support the trial court=s finding that termination of appellant=s parental rights was in the children=s best interest.  See id.  Viewing the same evidence in a neutral light,
we hold that it is also factually sufficient to support the trial court=s findings that termination of appellant=s parental rights was in the children=s best interest.  See id.  We overrule appellant=s two issues.








 

 

 

Conclusion

Having overruled all of
appellant=s issues, we
affirm the trial court=s judgment
terminating appellant=s parental
rights to John, Mary, and Tom.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL B:   LIVINGSTON, HOLMAN, and GARDNER, JJ.

 

DELIVERED:
June 5, 2008 











[1]See Tex. R. App. P. 47.4.





[2]We
are using fictitious names in accordance with proposed Tex. R. App. P. 9.8, 71 Tex.
B.J. 287-88 (Tex. 2008, scheduled to take effect Sept. 1, 2008).

 





[3]John
was diagnosed with cerebral palsy at the age of one and a half. 





[4]McBride
was incarcerated at the time of trial. 





[5]Tom=s
father is McBride, and he executed an affidavit of relinquishment. 





[6]Appellant
testified that John=s
father, N.J., was verbally abusive and that she never lived with him.  She did not know where N.J. was located.  N.J. was not present at trial. 





[7]Mila
and Buford filed a suit in intervention for access to Mary if M.C.=s and
appellant=s
parental rights were terminated.  The
trial court granted them reasonable visitation.





[8]The
trial court also terminated N.J.=s parental rights to his son
John, M.C.=s
parental rights to his daughter Mary, and McBride=s
parental rights to his son Tom.  None of
them have appealed the trial court=s order. 





[9]Tex. Fam. Code Ann. ' 263.405(i)
(Vernon Supp. 2007); see also In re S.B., 207 S.W.3d 877, 881 (Tex. App.CFort
Worth 2006, no pet.); In re D.A.R., 201 S.W.3d 229, 230 (Tex. App.CFort
Worth 2006, no pet.) (both analyzing this statute).





[10]Even
though appellant raised sufficiency challenges to the trial court=s
endangerment findings in her combined motion for new trial and statement of
points, on appeal she challenges only the legal and factual sufficiency of the
evidence to support the trial court=s best interest finding.